No. 16-16698

_____

**In the United States Court of Appeals
for the Ninth Circuit**

_____

LESLIE FELDMAN, *et al.*,

*Plaintiffs/Appellants*,

and

BERNIE 2016, INC.,

*Plaintiff-Intervenor/Appellant*,

v.

ARIZONA SECRETARY OF STATE'S OFFICE, *et al*.,

*Defendants/Appellees*,

and

ARIZONA REPUBLICAN PARTY, *et al.*,

*Defendant-Intervenors/Appellees*.

_____

On Appeal from the United States District Court
for the District of Arizona
No. CV-16-01065-PHX-DLR

_____

**PLAINTIFF-APPELLANTS' PETITION FOR REHEARING *EN BANC***

_____

*Attorneys for Plaintiffs-Appellants Leslie Feldman, Luz Magallanes, Mercedez Hymes, Julio Morera, Cleo Ovalle, Former Chairman and First President of the Navajo Nation Peterson Zah, the Democratic National Committee, the DSCC a/k/a the Democratic Senatorial Campaign Committee, Kirkpatrick for U.S. Senate, and Hillary for America:*

Daniel C. Barr
Sarah R. Gonski
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
DBarr@perkinscoie.com
SGonski@perkinscoie.com

Joshua L. Kaul
PERKINS COIE LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703
Telephone: (608) 663-7460
Facsimile: (608) 663-7499
JKaul@perkinscoie.com

Marc E. Elias
Bruce V. Spiva
Elisabeth C. Frost
Amanda R. Callais
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ACallais@perkinscoie.com

*Attorneys for Intervenor-Plaintiff/Appellant Bernie 2016, Inc.:*

Roopali H. Desai
Andrew S. Gordon
D. Andrew Gaona
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Telephone: (602) 381-5478
RDesai@cblawyers.com
AGordon@cblawyers.com
AGaona@cblawyers.com

Malcolm Seymour
GARVEY SCHUBERT BAKER
100 Wall Street, 20th Floor
New York, New York 10005-3708
Telephone: (212) 965-4533
MSeymour@gsblaw.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................8

I.    Plaintiffs are likely to succeed on their claim that HB2023 violates the Fourteenth Amendment. .................................10

    A.    The conclusion that HB2023 only imposed minimal burdens rest on errors of law.....................................11

    B.    The majority panel erroneously approved of rational basis review to evaluate State's interests. ...............16

II.    Plaintiffs are likely to succeed on their Section 2 claim. ...................19

    A.    The majority and the district court failed to consider the totality of the circumstances. ...................................19

    B.    The majority erred in failing to reach second step of VRA analysis. ................................................25

III.    The majority erred in concluding that the equities and the public interest favor Defendants. .....................................27

CONCLUSION ..................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................27

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)...............................................................11, 19

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ........................................................11

*Bartlett v. Strickland*,
  556 U.S. 1 (2009)...........................................................................23

*Burdick v. Takushi*,
  504 U.S. 428 (1992)..............................................................passim

*Chisom v. Roemer*,
  501 U.S. 380 (1991).......................................................................24

*Common Cause Ind. v. Individual Members of the Ind. Election
    Comm'n*,
  800 F.3d 913 (7th Cir. 2015) ........................................................17

*Crawford v. Marion Cty. Election Bd.*,
  553 U.S. 181 (2008)..............................................................passim

*Cuthair v. Montezuma-Cortez, Colo. Sch. Dist. No. RE-1*,
  7 F. Supp. 2d 1152 (D. Colo. 1998)...............................................20

*Easley v. Cromartie*,
  532 U.S. 234 (2001).......................................................................13

*Frank v. Walker*,
  773 F.3d 783 (7th Cir. 2014) ...................................................17, 18

*Gonzalez v. Arizona*,
  649 F.3d 953 (9th Cir. 2011) ..............................................9, 22, 26

## CASES (CONT.)

*Gonzalez v. Arizona*,
   677 F.3d 383 (9th Cir. 2012) ....................................................22, 26

*League of Women Voters of N. Carolina v. N. Carolina*,
   769 F.3d 224 (4th Cir. 2014) .........................................19, 22, 25, 28

*McCutcheon v. FEC*,
   134 S. Ct. 1434 (2014)..................................................................9

*NAACP v. McCrory*,
   No. 16-1498, -- F.3d --, 2016 WL 4053033 (4th Cir. July 29, 2016).....18, 20, 22

*Ne. Ohio Coal. for the Homeless v. Husted*,
   696 F.3d 580 (6th Cir. 2012) ............................................................12

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ....................................................17, 18

*Ohio State Conference of the N.A.A.C.P. v. Husted*,
   768 F.3d 524 (6th Cir. 2014), *vacated on other grounds*, No. 14-
   3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) ............................18

*One Wis. Inst. v. Thomsen*,
   2016 WL 4059222 (W.D. Wis. July 28, 2016)..................................14

*Planned Parenthood Ariz., Inc. v. Humble*,
   753 F.3d 905 (9th Cir. 2014) ....................................................11, 28

*Pub. Integrity All., Inc. v. City of Tucson*,
   No. 15-16142, 2016 WL 4578366 (9th Cir. Sept. 2, 2016) (en
   banc)......................................................................................passim

*Shelby Cty., Ala. v. Holder*,
   133 S. Ct. 2612 (2013).......................................................................5

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)...........................................................................25

*United States v. Blaine Cty., Montana*,
   363 F.3d 897 (9th Cir. 2004) ....................................................11, 25

**CASES (CONT.)**

*Veasey v. Abbot*,
   830 F.3d 216 ............................................................................20, 22, 26

*Wesberry v. Sanders*,
   376 U.S. 1 (1964) ...............................................................................9

*Whole Woman's Health v. Hellerstedt*,
   136 S. Ct. 2292 (2016), *as revised* (June 27, 2016) ...........................9

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886)...........................................................................9

**STATUTES**

52 U.S.C. § 10301(a) ..............................................................................19

52 U.S.C. § 10301(b) ..............................................................................19

A.R.S. § 16-545.........................................................................................7

A.R.S. § 16-548......................................................................................3, 7

A.R.S. §§ 16-1005(a)-(f)..........................................................................7

A.R.S. § 16-1017.......................................................................................7

A.R.S. § 16-1018.......................................................................................7

**RULES**

Circuit Rule 35-1......................................................................................9

Fed. R. App. P. 35(a)(1)-(2)......................................................................9

## OTHER AUTHORITIES

2016 General Election Publicity Pamphlet at 5
    (http://apps.azsos.gov/election/2016/General/pamphlet_english.pdf
    (last visited Oct. 31, 2016)) ...................................................................................2

Brahm Resnick, *12 news helps voter track down her early*, 12 News
    (Oct. 18, 2016) (http://www.12news.com/news/politics/12-news-
    helps-voter-track-down-her-early-ballot/337711816) (last visited
    Oct. 31, 2016) ..........................................................................................................2

Jude Joffee-Block, *Cty. Election Officials: Mail Early Ballots No
    Later Than November 1*, (KJZZ, Oct. 26, 2016)
    (http://kjzz.org/content/386836/county-election-officials-mail-
    early-ballots-no-later-nov-1 (last visited Oct. 31, 2016))....................................2

# INTRODUCTION

As a result of Arizona House Bill 2023 ("HB2023"), "[o]ne of the most popular and effective methods of minority voting [in Arizona] is now a crime." Doc. 52-2 at 29 (Thomas, C.J., dissenting) ("Dissent"). HB2023 made it a *felony* for Arizonans to engage in "ballot collection," a longstanding practice in which thousands of voters have relied on friends, neighbors, advocacy and political organizations, and campaigns to collect and deliver their early ballots to ensure they arrive by the 7 p.m. Election Day deadline. The largely unrefuted evidence in this case overwhelmingly demonstrates that minority voters disproportionately relied on ballot collection to vote. The evidence also shows that the elimination of ballot collection will impose substantial disparate burdens on voters in particular communities, such as those who live in rural areas and on tribal reservations and lack home mail delivery. To justify these burdens, Arizona has offered nothing more than a hollow incantation of "voter fraud," without a shred of supporting evidence. These justifications are pretextual, and under a proper application of Section 2 of the Voting Rights Act ("VRA") and the Fourteenth Amendment, HB2023 cannot withstand scrutiny.

Nevertheless, a sharply divided panel of this Court affirmed the district court's determination that HB2023 should not be preliminarily enjoined. In reaching that conclusion, the majority made several errors of law that conflict with

prior decisions of this Court—including an *en banc* decision issued less than two months ago—other courts of appeals, and the Supreme Court. If not remedied, these errors will result in the abridgement or denial of the fundamental right to vote of thousands of Arizona's voters, and minority voters in particular.

There is still time to protect these voters in the November general election. Ballot collection is most critical in the final days before the election, when it is too late to ensure that a ballot put in the mail will arrive by 7 p.m. on Election Day.[1] For the reasons that follow, the Court should grant *en banc* review and reverse the district court. For the same reasons, Plaintiffs ask that this Court enter an injunction pending appeal barring Defendants from enforcing HB2023.

---

[1] The Arizona Secretary of State's Office ("SOS") publicized that November 4 is the "[p]resumptive last day to mail a ballot back to the County Recorder." 2016 General Election Publicity Pamphlet at 5 (http://apps.azsos.gov/election/2016/General/pamphlet_english.pdf (last visited Oct. 31, 2016)). But the Maricopa County Recorder, responsible for elections in Arizona's most populous county, advised voters that USPS is not processing ballots as fast as it used to and advised voters to mail their ballots by November 1. *See* Jude Joffee-Block, *Cty. Election Officials: Mail Early Ballots No Later Than November 1*, (KJZZ, Oct. 26, 2016) (http://kjzz.org/content/386836/county-election-officials-mail-early-ballots-no-later-nov-1 (last visited Oct. 31, 2016)). Because of these issues, many did not receive their mail-in ballots until well after they expected to. *See* Brahm Resnick, *12 news helps voter track down her early ballot*, 12 News (Oct. 18, 2016) (http://www.12news.com/news/politics/12-news-helps-voter-track-down-her-early-ballot/337711816) (last visited Oct. 31, 2016). Others received ballots citing the wrong deadline for submission—November 18, ten days *after* Election Day. *See id*. This is all highly likely to exacerbate the burdensome impact of HB2023 on the fundamental right to vote.

## FACTUAL AND PROCEDURAL BACKGROUND

In recent years, Arizona has strongly encouraged voting by early mail-in ballot, and voting by early ballot now far surpasses any other means of voting in Arizona. In the last presidential election, nearly 1.3 million voters in Maricopa County alone requested early ballots, and 81% of all who participated voted by early ballot. ER491. As early voting has blossomed, many Arizonans have come to rely upon others to collect and hand deliver their voted early ballots, to ensure that they safely arrive by 7 p.m. on Election Day. ER194, 198-99, 200, 204-05, 209-10, 215-16, 219-20, 225-26, 231-32, 239-40, 245-46, 257-58, 264, 267-68, 270-72, 279, 281-82, 288-89, 507-08, 547-48, 552-53, 567-572, 589-90, 594, 596-98, 618-20, 627, 928-29; A.R.S. § 16-548. Ballot collection has been particularly crucial to minority voters, many of whom live in urban areas without secure outgoing mailboxes, or in rural areas—including reservations or border towns with Hispanic populations of over 95%—with no home mail delivery. ER209-10, 225-26, 246-47, 264, 268, 271-72, 299-300, 339-40, 508, 547-48, 571-72, 994-98, 2223-24. These same populations disproportionally lack reliable transportation to vote or deliver their ballot in person, and have economic or personal disadvantages that make ballot collection a critical means of voting. ER194, 198-200, 209-211, 214-16, 219-20, 225-26, 231-33, 239-40, 245-46, 257-58, 264, 267-68, 270-72, 279,

-3-

281-82, 286, 339-40, 507-08, 546-48, 571-72, 589-90, 594, 596-98, 618-20, 627, 928-30, 999, 1002.

As ballot collection has grown in popularity, legislators who have not traditionally enjoyed broad support in minority communities have repeatedly tried to restrict it. ER194-99, 246, 258, 267-68, 278.[2] In 2011, the Legislature passed SB1412, making it a misdemeanor to collect more than a certain number of ballots per election. ER194-97. Because of a long history of racial discrimination, Arizona was then a covered jurisdiction under § 5 of the VRA, and SB1412 was submitted to the Department of Justice ("DOJ") for preclearance.

DOJ's preclearance file paints a disturbing and revealing portrait of the law. State elections official Amy Bjelland admitted to DOJ that SB1412's ballot collection restrictions were "targeted at voting … in predominantly Hispanic areas" near the border and "[m]any in the [SOS]'s office were worried about the Section 5 review[.]" ER2352-53; *see also id.* (FBI and SOS found no fraud, but Bjelland thinks a problem "may result 'from the different way that Mexicans do their elections'"). A county official reported that the restriction would impact a border town where "almost everyone is Hispanic" and "where people … tend to bring up vote by mail ballots in groups." ER2345. A state legislator reported that the law was a reaction to an "explo[sion]" of "[t]he percentage of Latinos who vote

---

[2]  Arizona's minority voters, whose participation rates have skyrocketed in recent years, overwhelmingly prefer Democratic candidates. *See* ER2262-66, 2285.

by mail" in 2010, which "caused Republicans to raise accusations of voter fraud," though the claims were "baseless." ER2341-42. He expressed serious concern that SB1412 would negatively impact Latino and Native American voters. ER2341-42.

DOJ officials refused to preclear SB1412 unless Arizona provided more detailed information about the impact of its ballot collection provisions on minority voters. ER2339-40. Rather than provide answers, Arizona withdrew SB1412 from preclearance and repealed it the following session. ER198, 2347, 2350.

When the Supreme Court issued its decision in *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612 (2013), effectively suspending application of § 5, Arizona voters were stripped of the protection they had enjoyed since 1975 against discriminatory voting laws. ER340-41. That spring, the Legislature again targeted ballot collection by enacting HB2305, which contained a provision making it a misdemeanor to collect ballots on behalf of a political party and requiring other collectors to complete an affidavit. HB2305 (2013). Shortly after enactment, citizen groups gathered over 140,000 signatures to place HB2305 on the ballot for a straight up-or-down referendum vote. ER971. To avoid referendum, Republican legislators again repealed their own legislation along party lines, admitting publicly that their goal was to break the bill into smaller pieces and reintroduce individual provisions "a la carte." ER630-31; *see also* ER198-99, 267, 278. This they did in the 2015

legislative session, although that effort to restrict ballot collection died in committee. ER971.

In 2016, Republican legislator Rep. Ugenti-Rita introduced HB2023, which was even more extreme than its predecessors, making the "knowing[] collect[tion] of voted or unvoted early ballots from another person … a class 6 felony," punishable by up to a year in jail and a $150,000 fine. ER699. Representatives of minority communities argued HB2023 would disproportionately burden minority voters. ER278-79, 281. In particular, they discussed the importance of ballot collection in low-income urban communities, where minority voters often lack access to a secure outgoing mailbox. ER247-48. Representatives of tribal communities also pleaded on behalf of voters on reservation land, informing the Legislature that the bill could disenfranchise "over 10,000" voters who often live up to "40 miles away from the nearest post office box." ER511-13, 247-48; *see also* ER225-26, 231-33, 244-46, 264, 268, 271-72, 289, 299-300, 504, 506, 589-90, 511-13, 2223-24, 2227-29. In response, many legislators *laughed*. ER511-13. Supporters of HB2023 dismissed these barriers as "not my problem," ER510, and repeatedly characterized such voters as lazy, desiring "special treatment," or not taking "responsibility": "They certainly take care of themselves in other situations, so I don't know why we have to spoon-feed and baby them over their vote." ER532-33, 542-43, 576-77, 1073-74.

HB2023 was purportedly necessary to "prevent fraud," although not a single proponent could point to even one incident of ballot collection fraud. Arizona's criminal code has long protected against ballot collection fraud, *see* A.R.S. §§ 16-1005(a)-(f); *see also* A.R.S. § 16-545; A.R.S. §§ 16-1018, 16-1017, and even HB2023's sponsor admitted that "ballot fraud, electoral fraud, is already addressed all over [the elections code]," ER526-28. Further, there are substantial security measures already in place: voters can confirm ballot delivery online, ER215, 225-26; hand-delivered ballots are verified, ER196, 621-22; ballots are subject to rigorous signature-matching, A.R.S. § 16-548, ballot envelopes are tamper-proof, *id.*, and many collectors voluntarily implement additional security measures. ER205-06, 215, 220, 226, 929. When it was pointed out that Arizona already amply penalizes voter fraud: the bill sponsor claimed that HB2023 addressed "an activity that *could potentially lead to* [fraud]," ER600 (emphasis added); *see also* ER269-70, 279. Others contended it was enough that it purportedly addressed public "perceptions" of fraud. ER19-20. At the same time, proponents repeatedly rejected amendments to HB2023 that could have addressed their concerns about fraud —and "public perceptions" thereof—but imposed less of a burden on the right to vote, including permitting ballot collection if the collector and voter both signed an affidavit. ER205, 268-71, 279, 268-69, 557-77, 701-02, 701-02.

Less than six weeks after HB2023 was signed into law on March 9, 2016, Plaintiffs filed suit, alleging violations of the VRA and the Constitution. ER28. Plaintiffs quickly sought a preliminary injunction, which the district court denied on September 23. ER1. They filed a notice of appeal within hours, ER2856, and subsequently filed a motion for injunction pending appeal in the district court. ER2857. Two hours after the district court denied that motion, Plaintiffs filed an emergency motion for an injunction pending appeal and for expedited review with this Court. *See* ER2818-19; Doc. 16. The motions panel denied the request for an injunction but expedited the appeal. Doc. 27, Doc. 28. On October 28, the merits panel affirmed the district court's denial of injunctive relief by a 2-1 vote. Doc. 55-1, 55-2. On October 29, a judge *sua sponte* called for a vote to rehear the case *en banc*, and the parties were directed to file optional supplemental briefs by October 31. Doc. 56.

## ARGUMENT

HB2023 violates § 2 of the VRA and the Fourteenth Amendment. In affirming the district court's denial of the motion for a preliminary injunction, the majority departed from longstanding principles in VRA and Fourteenth Amendment jurisprudence and applied new frameworks not previously recognized by the Supreme Court or this Court and that run contrary to the decisions of both. If the majority's new approach is to be Ninth Circuit law, those principles should

be declared by this Court after full *en banc* consideration, not by a sharply divided 2-1 panel.

Rehearing *en banc* is appropriate where (1) the proceeding involves a question of exceptional importance, (2) consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions, or (3) the opinion of a panel directly conflicts with an existing opinion by another court of appeals or the Supreme Court and "substantially affects a rule of national application in which there is an overriding need for national uniformity." Circuit Rule 35-1; Fed. R. App. P. 35(a)(1)-(2). Here, review is appropriate for all three of these reasons.

This case implicates the fundamental right to vote. "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014) (Roberts, C.J., plurality op.); "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). This case indisputably presents questions of exceptional importance. *See generally Gonzalez v. Arizona*, 649 F.3d 953, 955 (9th Cir. 2011).

Further, the majority's opinion conflicts with decisions of the Supreme Court, this Court, and other appellate courts in several respects. *First*, and most problematically, the majority ignored the recent, clear direction from the Supreme Court to be vigilant when constitutional rights are at stake, *see Whole Woman's*

*Health v. Hellerstedt*, 136 S. Ct. 2292, 2310 (2016), *as revised* (June 27, 2016) and a clear edict from this Court, sitting *en banc* just two months ago, that rational-basis review is not appropriate to evaluate the validity of election laws under the Fourteenth Amendment. *Pub. Integrity All., Inc. v. City of Tucson*, No. 15-16142, 2016 WL 4578366 (9th Cir. Sept. 2, 2016) (en banc). *Second*, the majority departed from precedent in interpreting the VRA; although both the plain language of the statute and scores of cases make clear that VRA claims must be evaluated under the "totality of the circumstances," the majority affirmed the district court's atomistic assessment of the evidence, overlooked a voluminous and largely undisputed factual record establishing that HB2023 will disparately burden minority voters, and failed to even consider the factors that both the Supreme Court, the United States Senate, and courts across the country have held indispensible to an understanding of the "totality of the circumstances."

I.     **Plaintiffs are likely to succeed on their claim that HB2023 violates the Fourteenth Amendment.**

The majority made several serious errors of law, causing it to significantly devalue HB2023's burdens on voters, give too much deference to the state's proffered interests without conducting the required means-fit analysis, and conclude incorrectly that HB2023 is likely to be found constitutional. If left uncorrected, these errors will fundamentally alter Ninth Circuit law on challenges

to election laws under the Fourteenth Amendment and place it out of sync with the Supreme Court, sister circuits, and its own existing case law.

### A.  The conclusion that HB2023 only imposed minimal burdens rest on errors of law.

This Court reviews the denial of a preliminary injunction for abuse of discretion, which occurs when a district court "applies an incorrect legal rule or relies upon a factual finding that is illogical, implausible, or without support in inference that may be drawn from the record." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (quotation marks and citation omitted). The district court's legal conclusions are thus reviewed *de novo*, and its factual findings for clear error. *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014). Mixed questions of law and fact are reviewed *de novo. United States v. Blaine Cty., Montana*, 363 F.3d 897, 909 (9th Cir. 2004).

The Supreme Court has developed a balancing test to determine whether facially nondiscriminatory elections laws impose an "undue" burden on voters in violation of the Fourteenth Amendment. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). In applying the "*Anderson-Burdick*" test, courts "weigh 'the character and magnitude of the asserted injury to the rights … that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it

necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). This is a "flexible" sliding scale, in which "the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which [the challenged law] burdens [voting rights]." *Id.* The standard must be calibrated in each case to "[t]he precise character of the state's action and the nature of the burden on voters." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592-93 (6th Cir. 2012) (quotation marks omitted). *Anderson-Burdick* does not permit rational basis review or burden shifting. *Pub. Integrity All.*, 2016 WL 4578366, at *4 (en banc).

Despite these well-established principles, the majority affirmed the district court's application of rational basis review. It concluded that the district court did not err, first, in concluding that HB2023 did not "significantly increase the usual burdens of voting," Op. at 43, and, second, in determining that "laws that do not significantly increase the usual burdens of voting do not raise substantial constitutional concerns." *Id.* at 48. But these conclusions are untethered to both binding precedent and to the undisputed facts.

First, the majority rests its conclusion that HB2023 does not "significantly increase the usual burdens of voting" on an inapposite analogy to the facts present in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) (controlling op.). The majority concluded that HB2023, in its view, imposed a less severe burden

-12-

than the identification requirement at issue in *Crawford*. Op. at 45. But it failed to account for crucial differences between Arizona's election system and Indiana's. The majority stated that at most, the elimination of HB2023 would force a voter to make a single trip to a polling place, whereas in *Crawford* a voter would have had to make two trips. But a "simple" trip to a polling place in Arizona may require waiting in line for six hours, *see* ER264-66, 287, 296-97, and dropping off a ballot can constitute an 80-mile round trip. ER511-13. Further, it is undisputed that Arizonans are heavily reliant on early voting. Dissent at 8-9 ("[W]hen 80% of the electorate uses early absentee voting as the method by which they cast their ballots, the method has transcended convenience and has become instead a practical necessity."). And the record here, unlike in *Crawford*, is brimming with evidence about the burdens imposed by HB2023.[3] *See, e.g.*, ER203-06, 210-11, 216, 219, 225-27, 231-33, 240, 246-49, 259, 267, 271-72, 281-82, 289, 294, 928-30. *Crawford* itself makes clear that courts must not "apply[] any 'litmus test' that would neatly separate valid from invalid restrictions" and instead must "make the

---

[3] The majority compounded its errors by applying strict "clear error" review and not taking into account that the district court's decision relied only lightly upon factual findings: the factual record is largely undisputed, and the parties submitted on the papers without an evidentiary hearing. Dissent at 3 n.1. Thus, this Court is in no worse position to evaluate factual evidence than the district court was, and the rationale for deferring to the district court's factfinding does not apply. *See Easley v. Cromartie*, 532 U.S. 234, 243 (2001) (extensive review of district court's factual findings was appropriate because "key evidence consisted primarily of documents and expert testimony" and "[c]redibility evaluations played a minor role").

'hard judgment' that our adversary system demands." 553 U.S. at 190. Had the majority and the district court made that hard judgment, they could only have found that the largely *unrefuted* evidence consistently points toward significant burdens—as the dissent did. Dissent at 3-11.

Second, the majority amplified the effects of this error by refusing to consider the burdens on those most impacted by HB2023. Both the Supreme Court and this Court have made clear that the burdens imposed by a voting practice challenged under *Anderson-Burdick* are properly evaluated from the vantage point of the voters for whom the practice is likely to pose the most serious challenges. *See Crawford*, 553 U.S. at 181, 186, 191, 198, 201; *Pub. Integrity All., Inc. v. City of Tucson*, -- F. 3d --, 2016 WL 4578366, at *3 n.2 (9th Cir. Sept. 2, 2016) (en banc); *One Wis. Inst. v. Thomsen*, 2016 WL 4059222, at *35 (W.D. Wis. July 28, 2016); ER2620-22, 2631-33. Here, the undisputed evidence demonstrates that HB2023 imposes particularly severe burdens on rural voters who lack home mail delivery and urban voters who lack access to secure outgoing mailboxes. Appellants' Opening Br. ("Br") at 26-27 (Doc. 34); Dissent at 5-8. The majority declined to weigh the burdens by concluding that, because the precise number of impacted voters is not in the record, the evidence was "insufficient for such an analysis." Op. at 45 (citing *Crawford*, 553 U.S. at 199–203) (additional citations omitted). But the majority's focus on numerical precision misunderstands

*Crawford*'s point. *Crawford* made clear that the important inquiry is not how many are impacted but the *nature of the burdens* on voters—i.e., how burdensome the laws really were on impacted populations. 533 U.S. at 199.

Here, there is ample evidence detailing the severity of the burden. The dissent describes in detail the burdens on Native American voters who live on tribal lands. Dissent at 6 (uncontested evidence established Tohono O'odham Nation—which rests on land approximately the size of Connecticut—has no home mail delivery and only one post office); *id.* (undisputed that Cocopah Indian Tribe Reservation does "not have home mail delivery or easy access to a post office"). The undisputed evidence also showed that HB2023's burdens fell with particular severity on heavily minority rural communities near the Mexican-Arizonan border. *Id.* at 5 ("The record demonstrated that, in many rural areas with a high proportion of minority voters, home mail delivery was not available, and it was extremely difficult to travel to a post office"); *id.* (uncontested that "the rural communities of Somerton and San Luis, which are comprised of 95.9% and 98.7% Hispanic voters, respectively, were without home mail delivery and reliable transportation"). The record also contained ample evidence that HB2023 burdens minority voters in low-income urban neighborhoods who lack access to a secure outgoing mailbox and whose socioeconomic disadvantages—the result of hundreds of years of discrimination—make it more difficult to employ alternate means of voting, which

is in practice "illusory." Dissent at 7-9, 28; *see also* Br. at 26, Further, both the district court and the majority ignored direct evidence of voters who were only able to vote in prior elections because of ballot collection. *See* ER204-06, 210-11, 226, 232-33, 239, 929-30, 2236-37.

These errors caused the district court and the majority to understate the burden and to erroneously conclude that the criminalization of ballot collection would pose a mere "inconvenience," despite clear evidence to the contrary. *See* Dissent at 8-9. The majority's conclusions should be reexamined *en banc* and reversed.

### B. The majority panel erroneously approved of rational basis review to evaluate State's interests.

The majority went similarly astray in its assessment of the State's interests and discussion of the required means-fit analysis. Having incorrectly concluded that HB2023 did not significantly increase burdens of voting, they next affirmed the district court's contention that "laws that do not significantly increase the usual burdens of voting do not raise substantial constitutional concerns." Op. at 48 (citing *Crawford*, 553 U.S. at 198). But *Crawford* itself explained that, "[h]owever slight th[e] burden [on voting] may appear, … it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." 553 U.S. at 191 (internal quotation marks omitted). And as this Court reiterated just two months ago in an *en banc* decision, "*Burdick* calls for neither rational basis review

nor burden shifting." *Pub. Integrity All.*, 2016 WL 4578366, at *4, but rather a "balancing and means-end fit analysis." *Id.*; *accord Burdick*, 504 U.S. at 434; *Common Cause Ind. v. Individual Members of the Ind. Election Comm'n*, 800 F.3d 913, 928 (7th Cir. 2015).

Instead of engaging in "a precise means-end fit analysis," the majority and the district court uncritically credited the State's naked assertion that HB2023's burdens were outweighed by its interest in "preventing absentee-voting fraud and maintaining public confidence in elections." Op. at 47. In doing so, they absolved the State of its burden to show that its interests justify the specific voting burdens at issue, rather than merely *assert* that it is so. Op. at 49 (emphasis added); *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012) ("*OFA*") (restriction likely unconstitutional where "no evidence" to support "vague" state justifications); *Frank v. Walker*, 773 F.3d 783, 795 (7th Cir. 2014) (state's assertion of voter fraud without evidence "conjures up a fact-free cocoon in which to lodge the judiciary") (Posner, J., dissenting from denial of rehearing *en banc*); *id.* ("If the Wisconsin legislature says witches are a problem, shall Wisconsin courts be permitted to conduct witch trials?"); *accord Burdick*, 504 U.S. at 434 (balancing must "tak[e] into consideration" extent to which "interests make it necessary to burden the plaintiff's rights") (citation and quotation marks omitted).

By the majority's logic, a state can sidestep *Burdick*'s means-end fit analysis by reciting the "magic words": a general interest in fraud prevention. But as the Fourth Circuit recently reiterated in *NAACP*, "[t]his does not mean … that the State can, by merely asserting an interest in preventing voter fraud, establish that that interest outweighs a significant burden on voters." 768 F.3d at 547. Instead, "the state must articulate specific, rather than abstract state interests, and explain why the particular restriction imposed is actually necessary, meaning it actually addresses, the interest put forth." *Id.* at 545; *see also OFA*, 697 F.3d at 434. This the majority did not do. They additionally permitted the district court to credit the State's unsupported proclamation that HB2023 would "instill public confidence." Op. at 49 (citing *Frank v. Walker*, 768 F.3d 744, 754–55 (7th Cir. 2014)),[4] even though that contention is contradicted in this record: that 140,000 voters in Arizona signed a petition for a citizen-led repeal of a precursor bill strongly suggests that HB2023 undermines, rather than bolsters, public confidence in Arizona's election system. ER971. In simply assuming a means-end fit without conducting the

---

[4] *Frank* has been roundly criticized, including by the majority of the active judges in the Seventh Circuit, who joined Judge Posner in dissenting from a decision not to rehear that case *en banc*. *See Frank*, 773 F.3d at 783 (Posner, J., dissenting from denial of rehearing *en banc*). The continuing relevance of *Frank* is currently before the Seventh Circuit in two separate matters. But even *Frank* at least attempts to provide a theoretical linkage to public confidence by claiming that producing identification is common practice in various areas of life and makes citizens feel that the voting process is more secure. *Id.* at 751. Here, no party has offered even a theoretical link between HB2023 and increased public confidence.

-18-

searching inquiry required, the majority controverts binding precedent from Supreme Court and within this Circuit. *Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434; *Crawford*, 553 U.S. at 186, 191, 198, 201; *Pub. Integrity All.*, 2016 WL 4578355, at *3 n.2; *see also* Dissent at 3-4 n. 2, Br. 28-29. Had the majority conducted the appropriate analysis, it would have concluded that the burdens imposed by HB2023 are not justified by any concomitant state interest.

## II. Plaintiffs are likely to succeed on their Section 2 claim.

### A. The majority and the district court failed to consider the totality of the circumstances.

Section 2 of the VRA provides in relevant part: "No voting … standard, practice, or procedure shall be imposed or applied … in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation "is established if, based on the totality of the circumstances, it is shown that the political processes … are not equally open to participation by members of a [protected] class … in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

Courts have repeatedly found that the text of § 2 requires that, "'[i]n assessing *both* elements, courts should consider 'the totality of the circumstances.'" *League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d

224, 240 (4th Cir. 2014) ("*LOWV*") (quoting 52 U.S.C. § 10301(b)); *see also Veasey v. Abbot*, 830 F.3d 216, 248 (5th Cir. 2016 (en banc); *Cuthair v. Montezuma-Cortez, Colo. Sch. Dist. No. RE-1*, 7 F. Supp. 2d 1152, 1169 (D. Colo. 1998). Both the majority and the district court refused to consider the totality of the circumstances and in doing so committed the same error recently reversed by the Fourth Circuit: they "missed the forest in carefully surveying the many trees, carefully examining individual elements of evidence but refusing to survey the voting landscape as a whole." *McCrory*, 831 F.3d at 214.

Had the majority and the district court considered the totality of the circumstances, they would have found that Plaintiffs amply met their burden of demonstrating that HB2023 will have a disparate impact on minority voters. Plaintiffs offered four different types of evidence that all paint a consistent picture of significant and disparate burdens on minority voters.

*First*, Plaintiffs submitted "voluminous and undisputed" affidavits from partisan and non-partisan organizers, community advocates, legislators, volunteers, and individual voters across Arizona "showing the burden that the restriction on ballot collection would impose on minorities." Dissent at 21; ER1002, 2293, 2303, 2311, 245-49, 254, 257-58, 270-72, 281, 286, 299-301. *Second*, Plaintiffs presented legislative history demonstrating that legislators were aware that ballot collection was used disproportionately in minority communities and that HB2023

was passed in spite of this knowledge. ER247; *see also* ER225-26, 231-33, 244-46, 264, 268, 271-72, 289, 300, 506, 511-13, 2227-29, 2223-24. This evidence was also not disputed. *Third*, Plaintiffs submitted the preclearance file kept by DOJ on HB2023's precursor bill, SB1412. That file documents serious concern by legislators, elections officials, and DOJ itself that SB1412—a bill far *less restrictive* than HB2023—would disparately impact Arizona's minority voters. ER2339-53. That evidence is also undisputed; indeed, much of the file consisted of admissions by the SOS's own employees. ER2439.

*Finally*, Plaintiffs submitted extensive expert testimony, who concluded that minority voters in Arizona presently suffer disproportionately from a variety of socioeconomic and personal disadvantages—for reasons related to Arizona's long history of racial discrimination—that make them more vulnerable to HB2023's effects. The evidence demonstrated that Arizona's minority voters are thus statistically far less likely to have access to a vehicle, which complicates efforts to vote in-person or drop off ballots at a distant mailbox. ER1002, 2293, 2303, 2311; *see also* ER245-49, 254, 257-58, 270-72, 281, 286, 299-301. Minority voters lag behind their white peers in education levels, literacy, and English proficiency, all of which create obstacles to successfully navigating the voting process without personal assistance from volunteers and ballot collectors. ER999, 1001, 2293,

2302; *see also* ER231-32, 238-40, 928-31.[5] Voters in these communities are also more likely to change addresses more frequently, making it more difficult to locate the correct polling place, leading to a much higher rate of rejected ballots for inadvertently voting in the wrong precinct. ER999, 1002, 1012, 2311, 2724-32, 2293; *see also* ER928-31. Minority voters are far more likely than their white peers to have to wait in long lines when they attempt to vote in person. ER994-95, 999, 2292. These disparities are highly relevant to the question of whether HB2023 has a disparate impact, and are necessarily part of the "practical evaluation" of the "past and present reality" that must be considered. *Gonzalez*, 677 F.3d at 406; *see also NAACP v. McCrory*, No. 16-1498, -- F.3d --, 2016 WL 4053033, at *17 (4th Cir. July 29, 2016) ("These socioeconomic disparities establish that no mere 'preference' led African Americans … to disproportionately lack acceptable photo ID."); *Veasey*, 2016 WL 3923868, at *20; *LOWV*, 769 F.3d at 245 ("In assessing both [the disparate impact and causal] elements, courts should consider the 'totality of the circumstances'") (quoting *Ohio State Conference of the N.A.A.C.P. v.*

---

[5] Unfamiliarity with voting rules is of particular relevance under HB2023. In Arizona, ballots must be *received* by 7 p.m. on Election Day rather than *postmarked* by then; the evidence shows that this rule is little-known and that much of ballot collection takes place in the interim period during the last few days before Election Day, when low-information voters often do not realize that it is too late to mail in their ballot. ER204, 210, 269, 288, 300. A legislator proposed eliminating this confusion and lessening the need for ballot collection by changing the deadline so that ballots were marked timely if postmarked by Election Day, but that ameliorative amendment to HB2023 was rejected. ER557-63.

*Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014)).

The evidence discussed above all point in one consistent direction: HB2023's burdens will fall disparately upon minority voters in Arizona. Because Plaintiffs submitted substantial evidence, and Defendants did not rejoin with contrary evidence, Plaintiffs have amply met their burden under the preponderance of the evidence standard. *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009); *see* Dissent at 13-20, Br. at 16-21. The district court's inquiry should have ended there. If the majority's opinion is left to stand, it will require voting rights plaintiffs to meet an additional heightened evidentiary burden, not authorized by the VRA or other legal precedent, requiring them to produce not only evidence of disparate impact but also additional evidence that the burden did not also similarly fall on white voters.[6] Dissent at 21. The majority's affirmance of the district court's imposition of a heightened standard effectively required Plaintiffs not just to prove

---

[6] Both the district court and the majority chide Plaintiffs, in particular the Arizona Democratic Party ("ADP"), for not collecting granular statistical data on ballot collection usage prior to HB2023's enactment in order to present a detailed comparison of the racial makeup of voters who use ballot collection. Putting aside the fact that the ADP had no way of knowing such data would be necessary in future litigation, the argument ignores that the district court dismissed Plaintiffs' substantial non-quantitative evidence as "not compelling" because many declarants were partisan actors or community advocates, and stating that it had "no way of knowing whether the experiences of these declarants are attributable to their selective targeting or to statewide ballot collection trends." ER10. Neither the district court nor the majority explains why the district court's reasoning would not equally disqualify statistical data presented by ADP on precisely the same grounds.

their own case, but also to show that there was no other evidence available that *disproved* it. This argument fails to recognize that the State had the burden of rejoinder, not Plaintiffs. Dissent at 21-22, Br. 16-17, 18 n.8. It is also irreconcilable with the Supreme Court's warning that courts must reject restrictive readings of the VRA so as to "provid[e] the broadest possible scope," to effectuate "the broad remedial purpose of rid[ding] the country of racial discrimination in voting" for which it was enacted. *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citations and quotation marks omitted). *See* Dissent at 15, Br. at 24.

There is no evidence in the record that points to significant or disparate burdens on white voters. The only suggestion that there *might* be such evidence came unprompted from the district court, which speculated that because some rural communities in Arizona are predominately white, those voters may face the same difficulties as their minority counterparts. ER11.[7] But the evidence does not support that contention, and in fact reveals the opposite: that there is "plain and uncontroverted" evidence that HB2023 places a disparate burden on minority voters. Dissent at 19. The majority and the district court's steadfast refusal to

---

[7] The district court and majority failed to recognize that the burden to rural voters is not caused by their rural location itself but that their rural and tribal communities *lack home mail delivery*. There is no evidence that suggests that predominately white communities similarly lack mail services. As the dissent correctly noted, "[t]here are no white reservations in Arizona. There is no comparably sized rural area that encompasses a white-majority population." Dissent at 19.

acknowledge that all of the evidence consistently points to a finding of disparate burden is contrary to the weight of the evidence and constitutes legal error.

**B.   The majority erred in failing to reach second step of VRA analysis.**

Because the majority affirmed the district court's conclusion that Plaintiffs failed to present sufficient evidence of a disparate burden, neither applied the second part of the VRA test, which considers whether any disparate burden resulting from the challenged law is "in part … caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.'" *LOWV*, 769 F.3d at 240 (quotation marks and citation omitted); *see also Gingles*, 478 U.S. at 35-36, 47. In conducting this analysis, courts typically look to nine "Senate Factors." There is no requirement that each of these "typical factors" (which are "neither comprehensive or exclusive") "be proved or that a majority of them point one way or the other." *Blaine Cty.*, 363 F.3d at 903 (quoting *Gingles*, 478 U.S. at 45). However, in failing to consider Plaintiffs' extensive evidence that *eight* of the nine Senate factors are present here, the majority and the district court discarded the prism that the Supreme Court, the United States Senate, and countless other courts have held necessary to evaluate the totality of the circumstances and which further demonstrate Plaintiffs are likely to succeed on their VRA claim.

Had they properly considered the Senate factors, the majority would have concluded that Arizona has a long history of racial discrimination that permeates every area of social, political, and economic life. Br. at 21-22; *Gonzalez*, 677 F.3d at 406-07. As the *Gingles* court recognized, these circumstances are part and parcel of understanding the backdrop against which minority voters in Arizona live and vote today, and are crucial to assessing whether there is a § 2 violation. The effects of Arizona's systemic racial discrimination in areas such as education, employment and public life persist, profoundly impacting social, economic, and political life for minority citizens as reflected in disparate poverty rates, depressed wages, higher levels of unemployment, lower educational attainment, less access to transportation, residential transiency, and poorer health . ER231, 233-34, 264, 272, 286, 319-42, 364-69, 984-90, 999, 1006-07. These disparities contribute to unfamiliarity with the voting process and increase the "cost of voting." *See e.g.*, ER215, 219-20, 225, 231-32, 928-29. *Veasey*, 830 F.3d at 263. Had they properly surveyed these factors in considering the totality of the circumstances, the majority and the district court would have concluded that ballot collection alleviated many of these burdens, making it easier for these voters to exercise their right to vote. *See, e.g.*, ER204-05, 209-10, 215-16, 225-26, 231-33, 239-40, 257-58, 267-68, 288-89, 514-22, 552-53, 594, 928-29.

When properly viewed against the totality of the circumstances, it also becomes clear that the district court and majority's touting of other available voting methods ignores that many of these opportunities "are illusory." Dissent at 28, Br. 31-35. Had the majority considered the Senate factors as it was required to do, it would have properly concluded that "[t]he totality of the circumstances of this election, coupled with the historic discrimination in Arizona's electoral politics are sufficient to satisfy the second Section 2 requirement." Dissent at 22-28; *see also* Br. at 21-24.

## III. The majority erred in concluding that the equities and the public interest favor Defendants.

The district court's and majority's conclusion that "the balance of hardships and public interest weigh against" an injunction was largely derivative of their incorrect conclusions on the merits. The majority also erred by upholding the district court's failure to assess whether Plaintiffs raised serious questions on the merits and the balance of the hardships tips in their favor. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("Because it did not apply the 'serious questions' test, the district court made an error of law in denying the preliminary injunction[.]").

This Court has repeatedly recognized that "[t]he deprivation of constitutional rights unquestionably constitutes irreparable injury." *Humble*, 753 F.3d at 911 (quoting *Melandres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Thus, "[c]ourts

routinely deem restrictions on fundamental voting rights irreparable injury," recognizing that, "once the election occurs, there can be no do-over and no redress." *LOWV*, 769 F.3d at 247. Further, the State will suffer no prejudice even now; it has conceded that no decision is needed until "late in the game" because the injunction "would be essentially just saying not to enforce a new law." ER94-97, 100, 119-20, 122-23. It is undoubtedly true that Arizona has "a deep interest in fair elections." Op. at 58. But such an interest is not served by a law under which "one of the most popular and effective methods of minority voting is now a crime." Dissent at 29. HB2023 is a deeply troubling law, which undermines the fairness of elections in Arizona rather than bolsters it.

## CONCLUSION

If allowed to stand, the majority's decision will force the Ninth Circuit out of sync with longstanding precedent from the Supreme Court and this Circuit's prior decisions on the proper application of the VRA and the Fourteenth Amendment. Every day remaining in this election cycle provides an opportunity for citizens to cast their vote using ballot collection: a familiar, popular and longstanding method of exercising the franchise in Arizona. For the foregoing reasons, Plaintiffs respectfully request the Court order a rehearing of the case *en banc* and correct the errors of law evident in the district court's and majority's respective

opinions. In the interest of expediency, Plaintiffs respectfully request that the Court

conduct this rehearing on the papers only, without additional oral argument.

RESPECTFULLY SUBMITTED this 31st day of October, 2016.

s/ *Sarah R. Gonski*

Daniel C. Barr
Sarah R. Gonski
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Marc E. Elias
Bruce V. Spiva
Elisabeth C. Frost
Amanda R. Callais
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ACallais@perkinscoie.com

Joshua L. Kaul
PERKINS COIE LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703
Telephone: (608) 663-7460
Facsimile: (608) 663-7499
JKaul@perkinscoie.com

*Attorneys for Plaintiffs-Appellants Leslie Feldman, Luz Magallanes, Mercedez Hymes, Julio Morera, Cleo Ovalle, Former Chairman and First President of the Navajo Nation Peterson Zah, the Democratic National Committee, the DSCC, the Arizona Democratic Party, Kirkpatrick for U.S. Senate, and Hillary for America*

s/ *Roopali H. Desai*
Roopali H. Desai (# 024295)
Andrew S. Gordon (# 003660)
D. Andrew Gaona (# 028414)
COPPERSMITH BROCKELMAN PLC
2800 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004

Malcolm Seymour
GARVEY SCHUBERT BAKER
100 Wall Street, 20th Floor
New York, New York 10005-3708
Telephone: (212) 965-4533
MSeymour@gsblaw.com

*Attorneys for Intervenor-Plaintiff-Appellant Bernie 2016, Inc.*

-30-

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 31, 2016. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Sarah R. Gonski*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel for Appellants, certifies that this brief complies with the length limits permitted by the Clerk's Order at Doc. 56, and is jointly filed by separately represented parties. The brief contains 6,981 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

  s/ *Sarah R. Gonski*